UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THERESE M. MENTO,

                              Plaintiff,

        v.                                          **DECISION AND ORDER**
                                                           08-CV-74S
JOHN E. POTTER, *Postmaster General*

                              Defendant.

## I.  INTRODUCTION

        Plaintiff Therese M. Mento commenced this employment discrimination action by

filing a Complaint in the United States District Court for the Western District of New York.

(Docket No. 1.)  Therein, she alleges that Defendant discriminated against her based on

her sex, pregnancy, and pregnancy-related disability, subjected her to a hostile work

environment, and took retaliatory action against her.[1]  Plaintiff brings this action pursuant

to § 102(a) of the Civil Rights Act of 1991, 42 U.S.C. § 1981a and Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII").  Presently before this Court is

Defendant's Motion for Summary Judgment seeking dismissal of the complaint in its

entirety (Docket No. 76).  For the following reasons, Defendant's motion is granted in part

and denied in part.

---

        [1]This action was originally brought against John E. Potter, then Postmaster General of the United
States Postal Service.  On October 25, 2010, Patrick R. Donahoe replaced Potter as Postmaster General
and is substituted as the named defendant in this action pursuant to Federal Rule of Civil Procedure 25(d).
See Fed. R. Civ. P. 25(d) (public officer's successor automatically substitutes as party where predecessor
dies, resigns, or otherwise ceases to hold office while action pending).  This case's caption will be
modified accordingly.

## II.  BACKGROUND

### A.    Facts

Plaintiff first began working for the United States Postal Service ("USPS") on September 29, 1984 as a letter sorting machine clerk.  (Def's. Stmt. ¶¶ 6, 7, Docket No. 77.)[2]  Over approximately the next twenty years she held various jobs with USPS, including distribution clerk, flat sort operator, an "SPBS keyer," transfer clerk, express mail clerk, general clerk, and a sales and service associate, otherwise referred to as a "window clerk," tasked with helping customers at the post office, sorting mail, retrieving mail for customers, and processing passports.  (Id. ¶¶ 6, 7, 10, 11, 13, 18, 21, 22, 25, 28, 32, 33.)

Relevant to this case are the period Plaintiff worked as a window clerk at the Kenmore Post Office, both before and after she gave birth to her daughter, and the years after she left that position.

### 1.    Mento Starts Work at the Kenmore Post Office

Relevant to this case, Mento began working as a window clerk at the Kenmore, New York Post Office in or about November of 2003.  (Id. ¶ 36.)  Her original station manager was Rose McLellan.  (Pl.'s Stmt. ¶ 36, Docket No. 97.)  McLellan was replaced in December of 2004 by James Gavner, who became Plaintiff's direct supervisor.  (Id.)  At that time, Mento was approximately five-months pregnant.  A series of incidents then followed, ultimately culminating in the present lawsuit.

---

[2]This Court has accepted facts included in Plaintiff's and Defendant's Statement of Facts to the extent that they have not controverted each other's statements. See Local Rule 56(a)(2) (statements of material fact that are not specifically controverted by the non-moving party are deemed admitted).

Among these, one of the most significant occurred on January 26, 2005.[3]  Mento was instructed by Gavner to "clear the carrier." (Def.'s Stmt. ¶ 50.)  This entailed reviewing and signing off on certain paperwork for mail delivery drivers. (Id. ¶ 51; Pl.'s Stmt. ¶ 51.) Instead of immediately complying with Gavner's instruction, Mento first worked to complete a different task, moving equipment between the post office's loading dock and the front window. (Id. ¶ 52.)  Gavner repeated his instruction. (Id.)  Mento again did not go to clear the carrier, but helped complete a customer's passport application. (Pl.'s Stmt. ¶ 54.)  By the time Plaintiff left work she still had not cleared the carrier. (Def.'s Stmt. ¶ 55.)  As a result, Plaintiff received an oral warning from Gaver through Mike Brown, the Kenmore Post Office's union steward. (Id. ¶ 63; Pl.'s Stmt. ¶ 56.)  In response, Mento initiated an administrative discrimination proceeding through the USPS Equal Employment Opportunity office ("EEO"). (Pl.'s Stmt. ¶ 63.)

On January 31, 2005, based on her obstetrician's recommendation, Mento made a "light duty" request for a 25-pound lifting restriction. (Id. ¶ 66.)  This request was approved on February 2, 2005. (Def.'s Stmt. ¶ 68.)  On that day, Gavner stated that her medical restrictions would not be approved until she received written confirmation. (Pl.'s Stmt. ¶ 70.)

According to Mento, on that same day, as she left work, Gavner emerged from the Post Office and yelled at her, "[w]here is your paperwork?" (Def.'s Stmt. ¶ 73.)  When she responded that her station's financial closeout work was on the computer, he stated that he would be sitting down to talk with her the following day. (Id. ¶ 73.)

---

[3]Although this Court has sought to detail many of the incidents recounted by Plaintiff, it has not included every single factual allegation contained in her complaint.

Mento made a second light duty request on February 14, 2005, asking that her work be restricted to 24-hours per week.  (Pl.'s Stmt. ¶ 77.)  This request was granted on February 15, 2005.  (Id.)

On March 2, 2005, Gavner learned that Mento had filed an EEO complaint against him.  (Def.'s Stmt. ¶ 80.)  From this point on, Mento alleges that she experienced a series of acts she found discriminatory and related to her EEO filing.  On March 8, 2005, Gavner warned her to watch her "clock rings," referring to the times she would punch in and out of work.  (Id. ¶ 81.)  Gavner also described Mento's pregnancy as "her disability" and that she was being scrutinized because of this disability.  (Pl.'s Stmt. ¶ 81.)  On March 11, 2005, acting supervisor Mark Pfohl told Mento that he, too, was watching her clock rings.  (Def.'s Stmt. ¶ 82.)

Other incidents followed.  On March 14, 2005 Gavner posted a job vacancy for a postmaster position in which he knew Mento had an interest.  (Pl.'s Stmt. ¶ 88.)  But by the time Gavner posted this vacancy, the deadline for applications had already passed.  (Id.)  Then, on March 17, 2005, Gavner removed two of Mento's three floor mats from her work area, allegedly because he and another employee had tripped over them.  (Def.'s Stmt. ¶¶ 93, 95.)  These floor mats were used by employees to alleviate the strain of standing for most of the day.  No other employees' floor mats were removed.   (Pl.'s Stmt. ¶ 99.)

Mento called in sick to work on Friday, March 18, 2005.  (Def.'s Stmt. ¶ 106.)  In order to complete a financial closeout of Mento's drawer, Gavner broke into her cash drawer to retrieve money contained therein.[4]  When Mento came into work on March 21,

---

[4]The parties disagree as to whether this was because Mento had failed to keep her password on file or a duplicate key.  (Def.'s Stmt. ¶ 106; Pl.'s Stmt. ¶ 106.)

4

2005 Gavner attempted to give her new keys to her cash drawer.  (Id. ¶ 107.)  Plaintiff refused to accept the keys, believing that the manner in which they were being given was not in compliance with relevant post office regulations and because the drawer had not been audited.  (Id. ¶ 108)  A dispute resulted, ultimately ending with Gavner telling her to go home.  (Id. ¶ 111)  Plaintiff left.  (Id.)  It was later discovered that the drawer for which Gavner had asked Plaintiff to accept keys was, in fact, short $7.01.  (Id. ¶ 113.)  Gavner later signed a postal form that no letter of demand would be issued to Mento for this discrepancy.  (Id. ¶ 115.)  Nevertheless, this incident would later feature as one of the grounds for Mento's first suspension without pay.

On March 24, 2005 a mediation session was held, involving Mento and Ignatius Vaccaro, Gavner's direct supervisor.  (Pl.'s Stmt. ¶ 116.)  During that mediation, Vaccaro stated that Plaintiff would need to appear for a "Fitness for Duty" examination.  (Id.)  According to Plaintiff, such an examination is conducted for mental health or substance abuse reasons.  Discomforted by the implications of such an examination, she replied that she would not attend such an examination, but would instead continue working at the Kenmore Post Office.  (Id.)  The examination had been scheduled for March 28, 2005.

On March 29, 2005, Mento came into work but was informed that she first had to attend the fitness for duty examination and that she should not clock in.  (Id. ¶ 116.)  Mento proceeded to clock in anyway and, sometime later, injured herself when a flip-top counter door fell on her, scraping her arm, and resulting in her pregnant belly hitting the lower stationary counter.  (Id. ¶ 117.)  Feeling that her pants were wet, Mento became concerned that her water broke.  (Id.)  Mento was sent to the emergency room and released later that night, despite Gavner telling her that she would first need to go to the Postal Service

Medical Unit.   (Def.'s Stmt. ¶ 120.)   Mento did not do so, and, on April 1, 2005, approximately eight months into her pregnancy, delivered her daughter by emergency caesarian section.   (Id.)

On April 11, 2005 Plaintiff received notice that she was being suspended from work without pay for fourteen days.   (Id. ¶ 133.)   The basis for Mento's suspension was her failure to follow instructions and improper conduct on March 21 and 29, 2005.   (Id. ¶ 133.) Her letter of suspension states that she failed to follow Gavner's instruction to accept keys to her new cash drawer and to immediately clock out.  (Def.'s Ex. 12, Docket No. 85.)  She was also disciplined for failing to keep her fitness of duty examination appointment on March 28, 2005, and for clocking into work the following day despite instructions to the contrary.  (Id.)  On appeal, the suspension was upheld, but reduced from fourteen to seven days.  (Def.'s Ex. ¶ 135.)

### 2.   Mento Returns from Maternity and Disability Leave

Upon her return from an extended maternity and disability leave on November 9, 2005 Mento's problems with Gavner continued.   She asked Gavner what procedural and policy changes had been instituted in her absence.  (Id. ¶ 147.)  Gavner did not inform her of all changes.   (Id. ¶ 148.)   Gavner also directed a customer complaining about a comment Mento had made to contact Victor Laudisio, the Customer Relations Coordinator. (Pl.'s Stmt. ¶ 188.)   Plaintiff did not learn about this complaint until a pre-disciplinary interview on November 21, 2005.  (Id.)

Mento also had problems with other co-workers.   Myrlene Lee, a new acting supervisor, instructed Mento to punch in at exactly 8:15 a.m every morning, although, according to Mento, Lee did not apply the same strictness to other employees.  (Def.'s

Stmt. ¶ 151.)  On November 16, 2005 Mento got into a dispute with Brown over who would perform back room duties, including preparing mail for pick-up and clearing carriers, during which Brown accused her of not being a team player.  (Pl.'s Stmt. ¶ 153.)  Then, while on her lunch break, she became upset at the thought of working in the backroom while Gavner and Brown were the only other employees in the post office.  (Id.)  Plaintiff consequently contacted a postal inspector about being harassed and bullied at work, after receiving, what she viewed as ineffectual assistance from Pfohl, the acting supervisor.  (Id. ¶ 160.)  While on the phone, Brown walked past her three times leading her to suspect he was spying on her.  (Def.'s Stmt. ¶¶ 160, 162.)  After finishing the call she left the post office, leaving behind a leave slip with the word "harassment" written on it, which she gave to Pfohl.  (Id. ¶ 163; Pl.'s Stmt. ¶ 163.)  The following day, Plaintiff failed to appear for work and did not call in sick until approximately 10:00 a.m., which was approximately three hours after she would normally have been required to call in sick.  (Def.'s Stmt. ¶¶ 165, 167.)

On another occasion, another co-worker stated that everyone used to get along, and that it was going to be a long day, after Plaintiff was called to the front window to process a passport application.  (Pl.'s Stmt. ¶ 172.)  Plaintiff felt distraught and isolated and informed Lee, the acting supervisor, that she was going home sick.  (Id.)  Before she left, Gavner asked her to complete financial paperwork and to use his office.  (Id.)  There, she found, on his desk, a disciplinary form requesting she, again, be suspended for fourteen days.  (Id.)  Mento left, and did not resume work until December 10, 2005, in a new position, outside the Kenmore Post Office.  (Def.'s Stmt. ¶ 173.)

On December 16, 2005 Plaintiff received a 14-day suspension.  (Id. ¶ 175.)  The basis for this suspension was failure to properly discharge the duties of her position, and

being absent without official leave.  (Id. ¶ 175.)  Mento again appealed the suspension, which was also reduced to seven days.  (Id. ¶ 177.)

### 3.     Mento Leaves the Kenmore Post Office

Starting in October of 2005, Plaintiff applied for a number of positions for which she was rejected.  These included the position of complaint and inquiry clerk (Def.'s Stmt. ¶ 140), and an operations program support detail position on February 26, 2006 (id. ¶ 179). In March of 2006, she was not chosen for a number of other positions, including a claims and inquiry clerk work detail (id. ¶ 181), secretary to the manager of marketing detail (id. ¶ 183), ad hoc secretary (id. ¶4 185), and express mail tech (id. ¶ 187).  In March of 2008 she was initially not chosen for a work detail in the training department, but was provided it sixteen days later, after she complained to Sandra Damasiewicz, manager of distribution operations.  (Id. ¶¶ 189, 190; Pl.'s Stmt. ¶ 190.)

Additional incidents followed.  Around April 30, 2008, she was admonished by her supervisor, Yvonne Lewis, for speaking to senior plant manager Kathleen Burns without permission.  (Pl.'s Stmt. ¶ 194.)  On May 5, 2008, Lewis advised Damasiewics that Mento was not performing her duties in a timely manner.  (Id. ¶ 200.)

Plaintiff continued experiencing acute anxiety and her psychologist and physician deemed her unable to work.  (Def.'s Stmt. ¶ 203.)  From May 8, 2008 to May 3, 2009, Mento was off-work for mental health reasons.  (Id. ¶ 205; Pl.'s Stmt. ¶ 205.)  During this period, John Pietrzak, one of Mento's supervisors disputed whether her leave was supported by proper medical documentation.  (Id. ¶ 206; Def.'s Stmt. ¶ 206.)  When Mento returned to work she heard from Mike Bozek, a new supervisor, that Damasiewicz, Irene Barone, a labor relations specialist, and Kathleeen Burns, senior plant manager, had told

8

him to go through her file to find material on which to discipline her.  (Pl.'s Stmt. ¶ 209.)

**B.     Procedural History**

Mento filed her first administrative discrimination claim on January 28, 2005.  (Def.'s Stmt. ¶ 211.)  It was dismissed on October 11, 2005.  (Id. ¶ 213.)  The Equal Employment Opportunity Commission ("EEOC") affirmed the dismissal on November 1, 2007.  (Id. ¶ 214.)  She initiated a second administrative discrimination claim on November 2, 2005, which was dismissed on November 29, 2007.  (Id. ¶¶ 215; 217.)  A third administrative discrimination claim followed on February 19, 2006, and was dismissed on October 29, 2007.  (Id. ¶¶ 218, 220.)

On January 25, 2008 Plaintiff commenced the present lawsuit by filing a complaint in United States District for the Western District of New York.  (Docket No. 1.)  Defendant answered and the parties engaged in discovery under the supervision of the Honorable Hugh B. Scott, United States Magistrate Judge.  After a number of extensions, Defendant filed the instant motion for summary judgment on February 15, 2012.  Defendant's motion was fully briefed on April 30, 2012, at which time this Court took the motion under advisement without oral argument.

### III.  DISCUSSION

**A.     Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).  A fact is "material" if it "might affect the outcome of the suit under governing law."  Anderson, 477 U.S. at 248.  In a case where the non-moving party bears the ultimate burden of proof at trial, the movant may satisfy its burden by pointing to the absence of evidence supporting an essential element of the non-moving party's claim.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

At this stage, the function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.  Thus, summary judgment is not appropriate if "there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."  Ford, 316 F.3d at 354.

When deciding a motion for summary judgment, a court must view the evidence and the inferences drawn from the evidence "in the light most favorable to the party opposing the motion."  Addickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 1609, 26 L. Ed. 2d 142 (1970).   However, the party against whom summary judgment is sought "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002).  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

**B.    Plaintiff's Disparate Treatment**

Pointing to a combination of acts, Plaintiff alleges she has been discriminated against because of her sex, pregnancy, and pregnancy-related disability.  These include, but are not limited to, her assertions that she was subjected to:

- suspensions without pay
- threats of disciplinary action
- negative promotional recommendations
- disparaging remarks
- excessive and discriminatory monitoring
- removal of floor mats
- orders contrary to USPS regulations
- denial of preferential positions and failure to hire

It is well settled that in discrimination cases where there is no overt evidence of discriminatory conduct, claims brought under Title VII and § 1981 are analyzed under the burden-shifting analysis first set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). The burden-shifting test first requires that the plaintiff establish a *prima facie* case of discrimination.

**1.    *Prima Facie* Case**

"The burden of establishing a *prima facie* case of disparate treatment is not onerous." Tex. Dep't of Comt'y Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207 (1981); see also Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000) (characterizing the burden as "minimal").  To state a *prima facie* case, a plaintiff must show that (1) she is a member of a protected class, (2) she is qualified for her position, (3) she suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination. Weinstock v. Columbia Univ.,

11

224 F.3d 33, 42 (2d Cir. 2000) (citing McDonnell Douglas, 411 U.S. at 802).

### i.    Member of a Protected Class

As to the first element, Mento is clearly a member of a protected class.  Mento is a woman, and was pregnant for a substantial period of the time during which the allegedly discriminatory conduct occurred.[5]  Title VII prohibits "discriminat[ing] against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Further, the Pregnancy Discrimination Act of 1978 provides that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes."  42 U.S.C. § 2999e(k).  Pursuant to this provision, pregnancy discrimination is prohibited under Title VII.  Wills-Hingos v. Raymond Corp., 104 F. App'x 773, 774 (2d Cir. 2004) (summary order).

Defendant initially argues that because Mento ceased being pregnant after April 1, 2005, she cannot rely on that classification as the basis for her discriminatory claims.  But it is clear that "women who are pregnant at or very near the time of the adverse employment action are members of the protected class, as are women who are on maternity leave or recently have returned to work from maternity leave when the employment action occurs."  Helmes v. S. Colonie Cent. Sch. Dist., 564 F. Supp. 2d 137,

---

[5]Gavner started at the Kenmore Post Office on December 27, 2004.  At the time, Mento was approximately five months pregnant.  (Pl.'s Ex. A ("Mento Aff.") ¶ 17, Docket No. 98-1.)  There is no dispute that Gavner was aware of Plaintiff's pregnancy.

147 (N.D.N.Y. 2008).  Exactly how long an individual will continue to be a member of the protected class "depends on the facts and circumstances of the particular case."  Briggs v. Women in Need, Inc., 819 F. Supp. 2d 119, 127 (E.D.N.Y. 2011).  One of the factors to consider is how much time has passed since a plaintiff was last pregnant.  See Keller v. Great Lakes Collection Bureau, Inc., No. 02-CV-0719C(F), 2005 WL 2406002, at *4 (W.D.N.Y. Sept. 29, 2005) (plaintiff not pregnant for two years not member of protected class).  Another factor is the date of the adverse employment action, and when it was first set in motion.  Helmes, 564 F. Supp. 2d at 147.

Plaintiff gave birth on April 1, 2005.  She returned from maternity and disability leave on November 9, 2005.  (Mento Aff. ¶ 97.)[6]  She then left the Kenmore Post Office on November 29, 2005 and remained off work for disability-related reasons until she started in a new position elsewhere on December 10, 2005.

This Court concludes that, for purposes of discriminatory conduct occurring prior to her departure from the Kenmore Post Office, Plaintiff's allegations were within the period of time during which Plaintiff might still have been discriminated against based on her recent pregnancy and the allegations of continuing behavior during her maternity leave.  For purposes of establishing a _prima facie_ case, the discriminatory conduct alleged to have occurred while Plaintiff was at the Kenmore Post Office was sufficiently proximate to her pregnancy and her return from maternity leave.  Further, the most important actions taken against Mento, her suspensions from work without pay, on April 11 and December 16, were, in both cases close in time to her either giving birth or returning from maternity leave.

---

[6]There appears to be some ambiguity over when Plaintiff's maternity leave ended because she was also absent from work on extended disability leave.  (Mento Aff. ¶ 93.)

Additionally, the issues Plaintiff allegedly experienced following her return originated, and were intensified, by conduct occurring prior to her maternity leave.  See Pellegrino v. Cnty. of Orange, 313 F. Supp. 2d 303, 315 (S.D.N.Y. 2004) (irrelevant whether supervisors learned of pregnancy in April or July where process terminating plaintiff's job began on August 31, 2000); see also Solomen v. Redwood Advisory Co., 183 F. Supp. 2d 748, 754-55 (E.D. Pa. 2002) (plaintiff terminated eleven months after giving birth not member of protected class where no evidence that harassment or discriminatory statements continued or effects of pregnancy continued).  .

However, this reasoning does not hold for conduct occurring later, in 2006 and onwards, after Plaintiff had left the Kenmore Post Office.  As to these allegations, Plaintiff's pregnancy was sufficiently removed as to take her out of the class of individuals protected for pregnancy-related reasons.  Accordingly, as to those claims, Plaintiff will have to rely on her claim that she was discriminated against based on her sex.

### ii.      Qualified for Position

As to the second element, there is no dispute that Mento was qualified for her position.  Despite various disciplinary measures, Plaintiff remains employed with USPS and has been an employee there for nearly 28 years in a wide range of positions.

### iii.      Adverse Employment Action

As to the third element, an "adverse employment action is one that affects the terms, privileges, duration or conditions of employment."  Yerdon v.  Henry, 91 F.3d 370, 378 (2d Cir. 1996).  Plaintiff avers that she was subjected to multiple adverse employment actions.

14

Defendant takes umbrage with many of these and argues that the majority constitute minor issues that do not rise to the level of an adverse employment action.  Defendant specifically points to her claims that she was overworked because of other employees' absences, having her clock rings carefully monitored, not being informed of procedural changes after returning from leave, an employment opportunity not being posted until after the applicable deadline, removal of floor mats, her supervisor yelling at her, and delays in giving her a worker's compensation form.

Plaintiff does not dispute that many of the claims would, by themselves, be insufficient to constitute a disparate treatment claim, but instead relies on the decisions in Smith v. Westchester County, 769 F. Supp. 2d 448, n. 26 (S.D.N.Y. 2011) and Slinkowski v. Buffalo Sewer Authority, No. 97-CV-0677E(SR), 2000 WL 914118, at *9 (W.D.N.Y. June 29, 2000) for the proposition that "threats of discipline or excessive scrutiny . . . combined with other actions such as a decrease in pay or being placed on probation may constitute an adverse employment action."  (Pl.'s Resp. 6, Docket No. 104.)

This Court agrees that where incidents relate to each other, they may work in combination to constitute an adverse employment action.  See Moskowitz v. Coscette, 3 F. App'x 1, 5 (2d Cir. 2001) (summary order) (combination of disciplinary proceedings, assignment to desk duty, negative evaluations, and denial of promotion were sufficient basis for jury to find an adverse employment action).  The key inquiry remains, however, whether that combination changed the terms of a plaintiff's employment.  See Henton v. City of New London, No. 3:06 CV 2035(EBB), 2008 WL 2185933, at *12 (D. Conn. May 23, 2008) (approaching plaintiff for tardiness, disciplinary hearing, and written reprimand within one-month period not sufficient to show adverse employment action where plaintiff could

15

not show change in terms of employment).  Without such a change, negative evaluations alone, cannot establish an adverse employment action.  See Valentine v. Standard & Poor's, 50 F. Supp. 2d (S.D.N.Y. 1999), aff'd 205 F.3d 1327 (2d Cir. 2000).  But "increased monitoring, in combination with an allegation that monitoring was selectively applied, could contribute to a finding that an adverse employment action has taken place."  Deshpande v. Medisys Health Network Inc., No. 07-CV-375, 2008, WL 2004160, at *5 (E.D.N.Y. May 7, 2008).

Here, Plaintiff received two-week suspensions on April 11 and December 16.[7] Plaintiff received no pay during these periods.  This, in itself, is sufficient to constitute an adverse employment action.  See Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001) (even where plaintiff was later reimbursed, "suspension without pay is sufficient to constitute an adverse employment action"); McPhatter v. Cribb, 201 F.3d 431 (2d Cir. 1999) (plaintiff could show adverse employment action where he received series of disciplinary notices which in some cases resulted in fines and suspension without pay); Morales v. NYS Dep't of Labor, No. 5:06-cv-0899 (NAM/ATB), 2012 WL 1097318, at *17 (N.D.N.Y. Mar. 30, 2012) ("There is no question that plaintiff's one-week suspension without pay qualifies as an adverse employment action.").  Further, these suspensions, because they became part of her personnel file, may have affected her future employment prospects.  See Punsal v. Mount Sinai Servs. of Mount Sinai Sch. of Med. of N.Y. Univ., No. 01Civ.5410(CBM), 2004 WL 736892, at *9 (S.D.N.Y. Apr. 6, 2004) (reprimand letters likely to become part of employment file and adversely affect future employment

---

[7]In each case the suspension was reduced to one week.

constituted adverse employment actions in context of Age Discrimination in Employment Act claim). Indeed, Gavner went out of his way to warn others, alerting Maryann Molenda when she spoke to Gavner about assigning a work detail to Plaintiff, that Mento had disciplinary matters in her file. (Pl.'s Stmt. ¶ 146.) Molenda then interviewed Mento for the position of complaint and inquiry clerk, and rejected Plaintiff in October of 2005. (Id. ¶ 140.) It is thus certainly possible that disciplinary charges impacted her chances of getting that position.

Accordingly, Plaintiff has adequately supported her disparate treatment claim by identifying two suspensions without pay.[8]

### iv.    Inference of Discrimination

To satisfy the fourth element, a plaintiff must show that the circumstances of the alleged adverse employment action give rise to an inference of discrimination. Evidence showing that the plaintiff was treated "less favorably than other similarly situated employees outside [the] protected group" is one method of raising an inference of discrimination. Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003). To be successful, the other employees to whom a plaintiff compares herself must be "similarly

---

[8]A plaintiff may also show that she suffered from an "atmosphere" of adverse employment actions, by which "a combination of seemingly minor incidents" constitute an adverse employment action "once they reach a critical mass." Rooney v. Brown Group Retail, Inc., No. 08 CV 484(DRH)(AKT), 2011 WL 1303361, at *16 (E.D.N.Y. 2011) (quoting Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002)) (applying atmosphere of adverse acts analysis in Title VII context). This requires showing that "(1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." Phillips, 278 F.3d at 109. Plaintiff has not argued in favor of this standard. Even if she had, as discussed later in connection with her hostile work environment claim, it is questionable whether the incidents identified would rise to the level of severity and frequency necessary to sustain a claim under this standard. See Reckard v. Cnty. of Westchester, 351 F. Supp. 2d 157, 162 (S.D.N.Y. 2004) (series of minor and occasional inconveniences over two-month period insufficient to create unreasonably inferior work environment).

situated" in all material respects and must have engaged in comparable conduct for which they were treated differently.  Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997) (citing Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)).

Defendant argues that Plaintiff has failed to identify similarly situated co-workers and cannot establish an inference of pregnancy discrimination.  Defendant specifically points out that Plaintiff alleges that both male and female co-workers were treated more favorably.  But this argument misconstrues what pregnancy-discrimination means.  Mento is not limited to arguing that only men were treated more favorably.  The fact that other, non-pregnant, women may have also been treated better than Mento bolsters her contention that Defendant's alleged discriminatory conduct was pregnancy-based.  See Orr v. City of Albuquerque, 417 F.3d 1144, 1152 (10th Cir. 2005) (finding inference of discrimination where plaintiffs presented evidence that defendant treated at least one non-pregnant employee more favorably); Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 727 (7th Cir. 1998) (plaintiff could not establish *prima facie* case of discrimination where no similarly situated non-pregnant employees were treated more favorably); Anderson v. Dunbar Armored, Inc., 678 F. Supp. 2d 1280, 1309 (N.D. Ga. 2009) (no *prima facie* case of pregnancy discrimination where no evidence showed non-pregnant or male employees being treated more favorably).

Defendant's contention that the other employees were not similarly situated in other respects warrants closer scrutiny, but is also, ultimately, unavailing.  "An employee may be considered similarly situated to a co-employee if she was (1) 'subject to the same performance evaluation and discipline standards,' and (2) 'engaged in comparable conduct.'" Joseph v. N. Shore Univ. Hosp., No. CV 08-3799(ARL), 2011 WL 573582, at *11

18

(E.D.N.Y. Feb. 15, 2011) (quoting Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000)).  This requires a "reasonably close resemblance" between the respective incidents, rather than that they be "identical."   Graham, 230 F.3d at 40.   Factors relevant to this analysis include whether plaintiff and the comparators shared the same supervisor, were bound to follow the same procedures, and engaged in conduct of comparable seriousness. McKinney v. Dep't of Transp., No. 3:06-cv-2055 (WWE), 2010 WL 1883427, at *4 (D. Conn. May 11, 2010) (citing Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001)).

Here, Mento was suspended for leaving work without supervisory approval, for not completing financial responsibilities, and for failing to call in sick until almost two hours after her official start time.   Although arguably not of the same level of severity, Plaintiff has identified other employees who themselves frequently violated postal rules.   For example, whereas Mento was disciplined for leaving early and had her clock-in times carefully monitored, Brown stated that he was allowed to come in late and leave early.   (Pl.'s Ex. N ("Brown Dep.") 78:2-5, Docket No. 101-2.)   Other employees were permitted to engage in similar behavior.   (Id. at 78:2-11; Mento Aff. ¶ 21.)   Jean Rybacki, a co-worker also did not complete her financial responsibilities, but was not disciplined.   (Pl.'s Ex. C 96:14-20.)   In Mento's case such conduct served as a basis for disciplinary action.   (Def.'s Stmt. ¶ 176.)

Mento was also warned for failing to follow instructions.   Yet Brown, the union steward, was out of uniform on several occasions, contrary to USPS policy.   Brown admitted to wearing jeans, shorts, and sneakers and, at times, not wearing a tie or his nametag.   (Pl.'s Ex. N 108:3-15.)   Despite Gavner's instructions, and Brown's failure to adhere to them, Brown was never disciplined for any of these violations.   (Mento Aff ¶ 89; Brown Dep. 108:16-18.)   In fact, when Brown was warned that he could be disciplined he

19

merely laughed.  (Mento Aff. ¶ 89.)

Although it is true, as Defendant argues, that Plaintiff may have been disciplined more severely because of her prior infractions, see Padilla v. Harris, 285 F. Supp. 2d 263, 270 (D. Conn. 2003) (prior disciplinary problems may justify differential treatment of similarly situated employees), the fact that Brown was never disciplined, means that he was never at risk of having the same number of infractions.  An employer's persistent failure to discipline one employee, but not another, cannot serve as the basis for finding them differently situated.  Like Brown, Plaintiff had a spotless record stretching out over 20 years of service.  It was only when Gavner arrived at the Kenmore Post Office that she began having problems and building up a disciplinary file.

Conscious of the fact that "on all but the rarest of motions for summary judgment, [courts] should simply assume, for purposes of th[e] motion only, that plaintiffs have established a prima facie case," Pellegrino v. Cnty. of Orange, 313 F. Supp. 2d 303, 315 (S.D.N.Y. 2004), this Court concludes that Plaintiff has met her burden as to those acts alleged to have occurred while she was at the Kenmore Post Office.

The same cannot be said for those acts occurring after she left that office to become a mail processing clerk on December 10, 2005.[9]  As already discussed, although she may be considered a member of a protected class on the basis of her pregnancy during 2005, she must rely on an alternate basis for conduct occurring thereafter.  Here, Plaintiff has alleged that she was discriminated against based on sex.  However, as Plaintiff's own

---

[9]Although Plaintiff's second suspension was not imposed until December 16, 2005, because the circumstances giving rise to that suspension occurred while Mento worked at the Kenmore Post Office, this Court considers that suspension as a part of that time period.

20

deposition testimony attests, there is no evidence that Defendant denied her any of the positions for which she applied because she was a woman.  To the contrary, a majority of those positions went to other women.  Laura Lehmann was selected for the position of complaint and inquiry clerk.  (Def.'s Stmt. ¶ 140.)   Kimberly Muccaccio received the operations program support detail position.  (Id. ¶ 179.)  Muccaccio was also selected for the secretary to the manager of marketing detail position and the express mail tech position.  (Id. ¶¶ 183, 187.)  Three women were selected for the ad hoc secretary position.  (Id. ¶ 185.)  As to her other, post-Kenmore, claims, there is also no evidence suggesting a gender-based discriminatory motive.

Accordingly, while Plaintiff has made out a *prima facie* case as to that conduct which occurred while she was at the Kenmore Post Office, she has failed to do so in regards to claims originating thereafter.   As to those claims, Defendant's motion for summary judgment on Plaintiff's disparate treatment claim will be granted.

### 2.     Legitimate, Non-Discriminatory Reasons

Having met her initial burden of establishing a *prima facie* case as to some of her claims, a rebuttable presumption of discrimination arises, and the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for the employment action. Burdine, 450 U.S. at 254.   "This explanation must be 'clear and specific.'"   Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1226 (2d Cir. 1994) (quoting Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir. 1985)).   If the defendant succeeds in making this showing, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture." Weinstock, 224 F.3d at 42 (citing St. Mary's Honor Ctr.

v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed.2d 407 (1993)).

Defendant proffers Mento's numerous violations of USPS policy as a grounds for her two suspensions.  Plaintiff did not follow two instructions to clear the mail carrier, failed to accept a cash drawer, left work without supervisory approval, failed to complete her financial paperwork, and did not call in sick on time.  Although Mento challenges Defendant's characterization of each of these violations, she concedes that she was required to follow Gavner's directions and failed to do so.  Mento acknowledged that she violated postal policy relating to "Obedience to Order" and in fact "violate[d] it all the time." (Def.'s Ex. 2, 101:4-104:17; 155:5-156:6, Docket Nos. 80, 81.)   In appealing her suspension, the arbitrator similarly found that the "substitution of her judgment over the legitimate authority of management is not defensible." (Def.'s Ex. 13, p. 3, Docket No. 85.) The arbitrator added that Mento had engaged in a "blatant and deliberate violation of a direct order."  (Id. at 3-4.)

Such behavior is sufficient to warrant discipline and constitutes a legitimate non-discriminatory reason on which to base Plaintiff's suspension.  See, e.g., Oluyomi v. Napolitano, 811 F. Supp. 2d 926, 948-49 (S.D.N.Y. 2011) (failure to comply with one-day suspension constituted legitimate non-discriminatory reason for 14-day suspension); Redd v. N.Y.S. Div. of Parole, No. 07 CV 120(NGG)(LB), 2010 WL 1177452, at *10 (E.D.N.Y. Mar. 2, 2010) (failure to follow supervisor's instruction constituted legitimate non-discriminatory reason for suspension).  Defendant has therefore met his burden.

### 3.    Pretext

Because Defendant met his burden at the second stage, the burden returns to Plaintiff to prove that the Defendant's discrimination was intentional.  In this regard, a

22

plaintiff must produce "evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." Weinstock, 224 F.3d at 42. "Where a plaintiff has alleged that an employer's reasons for an adverse employment action are pretextural, all reasonable inferences must be drawn in favor of the plaintiff's showing of pretext." Hudson v. Greyhound Lines, Inc., No. 04 Civ. 10285, 2008 WL 819687, at *7 (W.D.N.Y. 2008) (quoting Joseph v. Manhattan & Bronx Surface Transit Operating Auth., No. 96 Civ. 9015, 2004 WL 1907750, at *14 (S.D.N.Y. Aug. 25, 2004)). "[T]he question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." Id. However, "[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." Id. (quoting Weinstock, 224 F.3d at 42). Put another way, a plaintiff has not shown that an employer's reasons were pretextual "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." Hicks, 509 U.S. at 515 (emphasis in original); Quarantino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995) (ultimate burden on plaintiff to show both that employer's reasons were false and that discrimination was real reason).

As an initial matter, Plaintiff has put forth sufficient evidence to find Defendant's purported reasons for her suspension false. As already discussed, Defendant subjected Mento to closer scrutiny and disciplined her for behavior that did not result in discipline for other employees. See Kerzer v. Kingly Mfg., 156 F.3d 396, 402-03 (2d Cir. 1998) (plaintiff may rely on same evidence used to support *prima facie* case to show pretext).

Mento has also presented sufficient evidence from which to infer that Gavner's motives in disciplining plaintiff went beyond her failure to strictly comply with USPS

regulations.  He disclosed, without prompting, the presence of discipline in her file when asked whether Mento was available for a work detail.  Further, when Mento was injured on March 29 after a counter-top fell on her, Gavner claimed that she clocked into work "with the intent of claiming an injury to herself."  (Pl.'s Ex. DD, Docket No. 102-3.)  According to Gavner, Mento allowed the counter to drop on her, in "an attempt to cover her impending absence due to maternity reasons with continuation of pay."  (Id.)  While this Court takes no position on what actually occurred, it is sufficient to note that Gavner's narrative supports finding that Plaintiff's subsequent disciplining for clocking in that day was motivated by Gavner's belief that Plaintiff was simulating an injury to take advantage of the medical compensation system and get paid benefits during her maternity leave.[10]

This view is reinforced by Gavner's removal of Mento's floor mats.  (Mento Aff. ¶ 53.)  Although these mats were allegedly removed because Gavner and a pool clerk, Marcia Ernst, tripped over them (Def.'s Stmt. ¶ 95) and because they constituted a "safety hazard" (Mento Aff. ¶ 56), the fact that other employees' mats were not removed demonstrate that Mento was singled out.  See Rommage v. MTA Long Island R.R., No. 08-cv-836 (DLI)(ALC), 2010 WL 4038754, at *9 (E.D.N.Y. Sept. 30, 2010) (quoting Hargett v. Nat'l Westminster Bank, USA, 78 F.3d 836, 839 (2d Cir. 1996)) ("A plaintiff may show pretext by demonstrating that similarly situated employees [outside plaintiff's protected class] were treated more favorably.").

Whether Mento has shown that discrimination was the real reason for Defendant's

---

[10]This was not the only incident highlighting Gavner's attitude towards Plaintiff.  On, what became, Plaintiff's last day at the Kenmore Post Office she decided to go home sick.  Gavner asked her to first complete her financial paperwork, and told her to use his office.  (Pl.'s Stmt. ¶ 172.)  Upon entering his office Mento discovered, lying on Gavner's desk, a form requesting a second period of suspension. Plaintiff maintains that this was no accident and, in light of other events, a jury would be entitled to agree.

actions is a closer question.  Most relevant to this is Mento's assertion that Gavner made disparaging remarks concerning her pregnancy.  Although Defendant describes the comment as "innocuous," Mento alleges that, on at least two occasions Gavner referred to her pregnancy as a "disability."  (Mento Aff. ¶¶ 42, 45.)  The first occasion followed her request for light duty.  (Mento Aff. ¶ 42.)  The second occurred on March 8, 2005 when Gavner told her that he was scrutinizing her clock rings because of her disability. (Mento Aff. ¶ 45.)

"Stray remarks alone are not generally sufficient to support a Title VII claim but must be accompanied by some other indicia of discriminatory animus."  Lichtenstein v. Triarc Cos., No. 02 Civ. 2626(JCF), 2004 WL 1087263, at *5 (S.D.N.Y. May 14, 2004) (citing Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001).  Nevertheless, "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007).  Factors considered in determining whether a comment constitutes evidence of unlawful discrimination or a stray remark include: "(1) who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decisionmaking process."  Hall v. Family Care Home Visiting Nurse & Home Care Agency, LLC, 696 F. Supp. 2d 190, 199 (D. Conn. 2010) (citation omitted).

Here, each of these factors favors finding the comments suggestive of a discriminatory motive.  First, Gavner was Mento's direct supervisor.  Second, the

25

statements were made only a month and a half prior to her first suspension.  The first comment also came after Plaintiff made a request for light duty in line with her obstetrician's recommendations.  Third, the description of pregnancy as a disability can easily be interpreted as evidencing a discriminatory mentality.  Fourth, the statements related to Defendant's decision to more closely monitor the times Plaintiff would clock in and out of work and Plaintiff was later disciplined for clocking into work when she had been instructed not to, leaving work early for feeling emotionally distressed, and not clocking in at her usual time.[11]  Thus, Gavner's comments are highly probative of his state of mind.

Dismissal would still be approrpiate if this were all Mento could rely on.  See Rajaravivarma v. Bd. of Trs. for Conn. State Univ., No. 3:09 CV1550 (VLB), 2012 WL 1019877, at *24 (D. Conn. Mar. 26, 2012) (statement that "guys from India are taking away all of these jobs," by itself, not sufficient evidence of race or national origin discrimination).  But given the evidence already discussed this Court finds that, although a close case, Plaintiff has met her burden of showing that Defendant's purported reasons were pretextual.  Together with Gavner's remarks, other non-pregnant employees were not treated as harshly as Plaintiff.  Gavner evinced a marked hostility to Plaintiff, suspecting her of faking injury.  Plaintiff has also contested Defendant's recitation of various of the events that resulted in her suspensions.

Viewed in combination and drawing all reasonable inferences in her favor, Mento's claim survives dismissal.  See Kerzer, 156 F.3d at 402-03 (statements that pregnancy indicated laziness, pregnant employees could be discharged by simply eliminating their

---

[11]Plaintiff called in sick at 10:03 a.m; her clock-in time was 8:15 a.m.  (Def.'s Stmt. ¶ 176.)

positions, unfriendly attitude following announcement of pregnancy, request to return to work early, dismissal shortly before return date, and hiring of replacement non-pregnant employee sufficient to create genuine issue of material fact as to pretext); Polito v. Tri-Wire Eng'g Solution, Inc., 699 F. Supp. 2d 480, 494 (E.D.N.Y. 2010) ("[G]iven the disputed circumstances surrounding Plaintiff's decision not to report to work the following Monday, the disparate disciplinary action taken by Defendants against Plaintiff could reasonably be viewed as a pretext for unlawful discrimination."). Summary judgment is also generally inappropriate on an employment discrimination claim where an employer's state of mind is disputed. See Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). In the present case, Gavner's motivations are central to Plaintiff's claim.

Accordingly, Defendant's motion for summary judgment as to Plaintiff's disparate impact claim relating to her time at the Kenmore Post Office and her two suspensions will be denied.

## C.    Hostile Work Environment

A plaintiff opposing a motion for summary judgment on a hostile work environment claim must elicit evidence "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003) (quoting Richardson v. N.Y State Dept. Of Corr. Serv., 180 F.3d 426, 436 (2nd Cir. 1999)) (alterations omitted). "The sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that she personally considered the environment hostile, and that the environment rose to some

27

objective level of hostility." Leibovitz v. N.Y.C. Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001).

"Absent extraordinary severity, a plaintiff must show that a 'series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.'" George v. Liverpool, No. 97-CV-1232, 2000 WL 1499342, at *6 (N.D.N.Y. Sept. 29, 2000) (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)). Factors to consider in examining whether a work environment is sufficiently hostile or abusive to support a Title VII claim include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." Leibovitz, 252 F.3d at 188; see also Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 605 (2d Cir. 2006). The appropriate test is whether the "harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997).

Here, although Mento was without question subjectively affected by the Kenmore Post Office's environment, she has failed to show that it was objectively severe or pervasive enough to "create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). Having expended most of her effort recounting the factual basis underlying her disparate treatment claim, Plaintiff does not layout the specific allegations intended to support her hostile work environment claim. Plaintiff simply states that she seeks to rely on the sum of her allegations to meet these requirements.

28

This Court has previously found that courts "should not carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode." Turley v. ISG Lackawanna, Inc., 803 F. Supp. 2d 217, 248 (W.D.N.Y. 2011) (quoting Burns v. McGregor Elec. Indus., Inc., 955 F.2d 559, 564 (8th Cir. 1992)).  But even considered together, Plaintiff has only submitted a laundry list of inconveniences, disagreements, and arguments, none of which are of the type of severity or persistence necessary to sustain a hostile work environment claim.  See, e.g., Brown v. N.Y. State Dep't of Corr. Servs., 583 F. Supp. 2d 404, 416-17 (W.D.N.Y. 2008) (racial slurs, offensive sexual contact, threats, punctured car tires, hard shoves and bumps, thrown metal objects, chain wrapped around neck sufficient to support hostile work environment claim).

For example, in late January of 2005 the post office was shorthanded because of the absence of a number of employees, resulting in there being no one to relieve Mento for lunch.  But this was not part of a longer trend of absences that consistently forced Plaintiff to work through her lunch hour.  Gavner also gave her an oral warning through Brown, who was the union steward, even though she was not, at that time, a union member.  This can hardly be seen as egregious conduct.  Likewise, although her medical restrictions were not recognized until she received the physical letter of confirmation from USPS, this, again, while irritating, was hardly harassing.

These incidents, and others, were also not "sufficiently continuous and concerted to be considered pervasive."  Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999).  In connection with this, it is relevant to note that Plaintiff worked at the Kenmore Post Office from approximately November 1, 2003 until December 10, 2005.  The actual incidents alleged to have created the hostile environment did not begin until, at the earliest,

29

January 24, 2005. Additional incidents occurred from that date until March 29, when Mento had her counter-top injury. Mento then gave birth on April 1 and was not cleared to return to work until November 9, 2005. She left the Kenmore Post Office on November 29, 2005, to eventually return to work in a different position, at a different location. Even crediting all of Plaintiff's allegations, the period of workplace harassment only lasted around three months, and even that was broken up by a lengthy period of leave. See Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir. 1987) ("Because the claimed incidents in the instant case are few in number and occurred over a short period of time, they fail to allege a racially hostile working environment"); see also Richmond v. Gen. Nutrition Ctrs. Inc., No. 08 Civ. 3577(LTS)(HBP), 2011 WL 2493527, at *16 (S.D.N.Y. June 22, 2011) (frequent, highly offensive remarks over long period of time in combination with adverse employment actions sufficient to support hostile work environment claim).[12]

Defendant's motion for summary judgment on Plaintiff's hostile work environment claim will therefore be granted.

**D.   Retaliation**

Retaliation claims under Title VII are also analyzed under the McDonnell-Douglas burden-shifting analysis. Richardson, 180 F.3d at 443. The allocation of burdens of proof in retaliation claims parallels that of discrimination claims. Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (citations omitted). However, the elements of a *prima facie* case for retaliation differ somewhat. To prevail on a retaliation claim, the plaintiff

---

[12]It is further unclear that all of these incidents occurred "because of her membership in a protected class." Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 241 (2d Cir. 2007). The absence of other employees from work, for example, cannot be tied to any discriminatory intent.

must show that (1) she participated in a protected activity, (2) her participation was known to the defendant, (3) she suffered an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse employment action. Richardson, 180 F.3d at 443; Jones v. Smithkline Beecham Corp., 309 F. Supp. 2d 343, 356 (N.D.N.Y. 2004).

Mento filed a total of three administrative discrimination claims on January 28, 2005, November 2, 2005, and February 19, 2006.  There is no dispute that these constituted protected activities.  Defendant argues that any allegations occurring prior to that date cannot logically be related to Plaintiff's retaliation claim.  As with Mento's disparate treatment claim, Defendant further argues that it had a legitimate non-retaliatory basis for disciplining her and that she has failed to identify an adverse employment action.  Finally, Defendant asserts that she cannot rely on the decisions not to hire her for various positions because there is no evidence that she was rejected for discriminatory reasons.

### 1.    January 28, 2005 and November 2, 2005 Charges

Mento's first EEO filing alleged sex and disability-based discrimination.  Gavner did not learn about this filing until March 2 and Mento was not suspended until April 11, allegedly as a result of her conduct on March 21 and March 29, 2005.  These allegations, in themselves, suffice to make out a *prima facie* claim of retaliation.

Plaintiff was engaging in protected activity that was known to her supervisor.  As already discussed, she did suffer an adverse employment action when she was suspended, on two occasions, without pay.  Finally, Mento has sufficiently shown a causal connection.  "The causal connection needed for proof of a retaliation claim can be

established indirectly by showing that the protected activity was closely followed in time by the adverse action." Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001). Certainly her suspension on April 11, just over a month after Gavner learned of her filing, is close enough in time to "permit a jury to infer a causal connection." Lovejoy-Wilson, 263 F.3d at 224 (inference permissible where complaint served at beginning of month and plaintiff suspended later that same month). Further, both the comments Gavner made, describing Plaintiff's pregnancy as a disability, and Gavner's more favorable treatment of other employees, also support such an inference. See Leibowitz, 584 F.3d at 502 (discriminatory intent may be derived from "invidious comments about others in employee's protected group" as well as "more favorable treatment of employees not in the protected group").

Mento initiated a second charge of discrimination on November 2, 2005. In it, she alleged discrimination because Gavner disclosed that she had discipline in her file. As before, she was suspended only a little over a month later. On this second suspension, however, circumstances preclude her from establishing a *prima facie* case. Most significantly, it is unclear whether anyone involved in her suspension was aware of her second EEO filing. Gavner's response to the EEO investigative affidavit is, for example, dated January 26, 2006, long after her December 16 suspension. (Pl.'s Ex. FF)

Nor can the second suspension be brought under the umbrella of the first. While it is true that "for purposes of a prima facie case . . . five months is not too long to find the causal relationship," Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010), here Gavner learned of the first filing on March 2. The second suspension was not until December 16. Even a four-month temporal gap is "considered quite weak temporal

correlation in this Circuit," Pellegrino v. Cnty. of Orange, 313 F. Supp. 2d 303, 317 (S.D.N.Y. 2004), much less the eight-month gap that would need to be bridged in this case. Although Mento has made many other allegations, these are relevant only in as much as they lead up to her suspensions without pay, and, in any case, are insufficient to cover a period that long.  As already discussed, for most of the period between when Gavner first learned of the EEO filing and Plaintiff's second suspension, Mento was out on maternity and disability leave.  Even Gavner's comment that Mento had discipline in her file occurred while Mento was on maternity leave, sometime around September of 2005.  (Pl.'s Stmt. ¶¶ 140, 146.)  This was six months after Gavner learned of her first filing.

Accordingly, although Mento has made out a *prima facie* case of retaliatory discrimination as to her first suspension, she has not done so as to her second suspension.

Proceeding to the next part of the McDonnell-Douglas burden-shifting analysis, Defendant has, again, presented a legitimate non-discriminatory reason for the adverse employment action – namely, Mento's failure to follow instructions and improper conduct on March 21 and March 29, 2005.  The only issue remaining is thus whether Mento can show pretext.

Two aspects of Mento's case most strongly favor a finding of pretext.  First, in June of 2007, Defendant offered to expunge Plaintiff's disciplinary record if she discontinued her EEO claims.  (Mento Aff. ¶ 136.)  Second, when Mento contacted Acting Postmaster Kevin Cleary, he said that although he would act as a personal reference for her, he would need to inform whoever Plaintiff worked under that she had an ongoing EEO case, so they would not be "blind sided."  (Pl.'s Stmt. ¶ 140.)  Similarly, District Manager David Patterson

informed Plaintiff that he would not get involved in her case because of the pending EEO investigation. (Id.) In the end neither fact is sufficient to resist dismissal.[13]

Defendant's June 2007 offer was made long after the suspension in question and after the first complaint was dismissed. Although relevant to the second filing, as already discussed, Plaintiff has failed to make out a *prima facie* case as to that filing. The 2005 communications to Cleary and Patterson also do not evidence pretext, but only acknowledge that it would have been improper for either of them to meddle in a matter under active investigation. Their involvement might actually have called into question the impartiality of the EEO proceeding.

Additionally, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001). Plaintiff's problems began well before Gavner learned of her EEO filing, including the carrier incident and Gavner's failure to post vacancies for the postmaster position coveted by Mento. Finding nothing else supporting her assertion that the suspension was caused by her EEO filing, Plaintiff must rely exclusively on temporal proximity which, without other grounds for finding pretext, is insufficient to withstand Defendants' motion.[14]

---

[13]The decision by three supervisors to ask a fourth to find a reason to discipline Mento did not occur until around May 3, 2009, long after her first and second EEO complaints were dismissed. (Def.'s Stmt. ¶¶ 213, 217.)

[14]Mento also claims to have been denied the position of injury compensation clerk. But Mento has only stated that the selecting official, Mary McNeill, may have made her decision with a retaliatory motive. There is no evidence that McNeill even knew about any of Mento's EEO filings. (Def.'s Ex. 15 ("Mento Dep."), 78:17-20, Docket No. 86.)

Accordingly, the Defendant's motion for summary judgment on Plaintiff's retaliation claim as to her first and second EEO filings will be granted.

### 2.    February 19, 2006 Charge

Plaintiff filed a third EEO claim on February 19, 2006.  She alleges that, as a result of that filing, she was not selected for the following positions: operations program support (February 2006); secretary to the manager of marketing (March 2006); ad hoc secretary (2006); and express mail tech (March 2006).  But Plaintiff's claim fails at the *prima facie* stage.  As to the operations program support position, there is no evidence that Lentz knew of her EEO filing.  As to the other posts, Mento only stated that it was a "possibility" that she had been retaliated against for her EEO activity.  (Mento Dep. 94:4-11, 103:17-21.) Although Plaintiff argues that she was more than qualified for these positions, it is necessary that the individuals who denied her these posts actually knew about her EEO activity.  Otherwise, it would be impossible for them to retaliate against her on that basis. Indeed, Mento herself admitted that although she claimed she was bypassed for various positions, "I don't know who or for what reason."  (Id. 109:15-17, Docket No. 86.)  It is further undisputed that, although Mento did not receive certain positions, she did receive others, including the mail processing clerk position and a work detail in the training department. (Def.'s Ex. 3, pp. 29, 34)  Mento's assertions are thus insufficient to make out a *prima facie* claim of retaliation, and Defendant's motion as to Mento's third EEO filing will be granted.  See Woodman v. WWOR-TV, Inc., 411 F.3d 69, 85 (2d Cir. 2005) ("[C]onclusory statements, conjecture, or speculation are inadequate to defeat a motion for summary judgment") (citation and quotation marks omitted)).

Other incidents Plaintiff refers to are too far removed in time from her EEO filing and actually occurred after the EEO claim was dismissed on October 29, 2007. These include claims that her supervisors were looking for a reason to discipline her, disputes over her work duties and training, and problems relating to her leave status.[15]

Accordingly, Defendant's motion for summary judgment as to Plaintiff's retaliation claim will be granted in full.

### E.    Damages

Defendant, in his motion for summary judgment seeks resolution of a number of issues relating to Plaintiff's damages claims. Having concluded that at least part of Plaintiff's disparate treatment claim will go forward, this Court finds resolution of these issues appropriate.

### 1.    Postmaster Position

Plaintiff frequently references her aspiration to become a postmaster and argues that her inability to obtain that position was the result of Defendant's discriminatory conduct. Defendant points out that despite working at the post office for over 20 years, the vast majority of that time coming before any of the alleged discrimination, Mento never held a management or supervisory position. Plaintiff retorts that she was never informed that she lacked the qualifications to become postmaster, even after speaking with Gavner, and took several non-mandatory courses for purposes of advancing her career. (Mento Aff. ¶¶

---

[15]Because this Court finds that these claims do not suffice to enable Plaintiff to make out a *prima facie* case of discrimination or retaliation, it does not address Defendant's alternative argument that these claims are barred by Plaintiff's failure to exhaust her administrative remedies.

3, 31, 49.)[16]

A failure to promote claim under Title VII requires that a plaintiff show that "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." Estate of Hamilton v. City of New York, 627 F.3d 50, 55 (2d Cir. 2010) (citation omitted). Nowhere in Plaintiff's extensive, and lengthy, allegations has she argued that she applied for, and was rejected, for the position of postmaster. Similarly, she has provided no support for her contention that she was qualified for the position, or even what the relevant qualifications would be. At most, she has argued that Defendant's discriminatory conduct resulted in disciplinary suspensions that marred her otherwise spotless career, and inhibited her from gaining the position. But if, as Plaintiff's legal memorandum states, she had already applied for several postmaster positions, and been interviewed for one of them, it is unclear what she was missing or how the various other positions she applied for would have strengthened her application. It is even unclear whether any of the other positions would actually constitute a promotion. Moreover, without having reapplied for a postmaster position, and been rejected from it, the contention that she would not have been chosen is purely speculative. Although Plaintiff has pointed out that a postmaster position was only belatedly posted by Gavner, no details

---

[16]Plaintiff's memorandum of law further asserts that she applied for several postmaster positions and was actually interviewed for one of them. No factual citation is provided in support of this contention.

are provided on that position, or whether Mento could have successfully applied for it.[17]

This Court thus agrees with Defendant's argument that Plaintiff has not shown that she was denied or prevented from successfully applying for a postmaster position. Damages as a result of such denial are therefore precluded.

### 2. Lost Wages

To the extent Mento seeks to recover damages relating to her spouse's lost wages, Defendant has argued, and Plaintiff has not disputed, that such damages cannot be recovered in a Title VII action by an employee subjected to discrimination. See Stoczynski v. Verizon Commc'ns, Inc., No. 04-CV-864A, 2006 WL 3030781, at *3 (W.D.N.Y. Oct. 20, 2006) (consortium claim cannot be predicated on Title VII claim); Murphy v. Cadillac Rubber & Plastics, Inc., 946 F. Supp. 1108, 1125 (W.D.N.Y. 1996) (federal courts do not recognize consortium or other derivative claims based on federal civil rights violations, including under Title VII). Accordingly, Plaintiff is precluded from recovering her husband's lost wages.

### 3. Federal Employees Compensation Act

Despite conceding that she lacks any medical evidence, Plaintiff nevertheless argues that she should not be precluded from recovering damages for her counter-top injury or the premature birth of her child. The purely speculative nature of this claim would be sufficient to preclude recovery.[18] Cf. Chamblee v. Harris & Harris, Inc., 154 F. Supp.

---

[17]The vacancy notice lists multiple cities that had a vacant postmaster position. Plaintiff has not shown that she would have been a fit for any of them, or that in fact she would have accepted such a position. (Pl.'s Ex. NN, Docket No. 103-5.)

[18]The closest Plaintiff gets to showing that Defendant was responsible for her premature birth is a physician's statement that stress can increase the risk of placental abruption. (Pl.'s Ex. O ("Schneider Dep."), 83:8-17, Docket No. 101-3.) This is, of course, insufficient.

2d 670, 678 (S.D.N.Y. 2001) (excluding as too speculative contention that plaintiff contracted sexually-transmitted disease from supervisor where no medical proof was submitted that supervisor had disease).  Additionally, Mento does not dispute that her counter-top injury was an accident resulting from her own inattention.  (Mento Aff. ¶ 81.) Thus, if she were to recover at all, it would be under the Federal Employees Compensation Act ("FECA"), not Title VII.  See Votteler v. United States, 904 F.2d 128, 130 (2d Cir. 1990) ("FECA is the exclusive remedy for work-related injuries sustained by federal employees.").

### 4.    Punitive Damages

Mento's complaint also seeks punitive damages for Defendant's actions.  Defendant seeks preclusion of such damages on the basis that punitive damages are not available against the federal government.  Generally, "[p]unitive damages are available under Title VII where an employer discriminates or retaliates against an employee with 'malice' or reckless indifference' to the employee's federally protected rights."  Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 572 (2d Cir. 2011) (citation omitted).  Such recovery is unavailable, however, when the claim is brought against the federal government.  Terry v. Aschcroft, 336 F.3d 128, 153 (2d Cir. 2003) (citing 42 U.S.C. § 1981a(b)(1)).  This includes claims against the postal service.  Mathirampuzha v. Potter, 371 F. Supp. 2d 159, 164 (D. Conn. 2005) (postal service, although commercial-like operation, is part of federal government and not subject to punitive damages under Title VII).  Plaintiff does not dispute this fact, and is precluded from recovering punitive damages.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment on Plaintiff's disparate treatment claim is denied as to those allegations relating to her two suspensions while at the Kenmore Post Office.  Defendant's motion is granted in all other respects.

## V.  ORDERS

IT IS HEREBY ORDERED, that Defendant's Motion for Summary Judgment (Docket No. 27) is GRANTED, in part, and DENIED, in part.

FURTHER, that the Clerk of the Court is directed to amend the caption of the case to reflect that Patrick R. Donahoe has replaced John E. Potter as Postmaster General.

SO ORDERED.


Dated:      May 21, 2012
            Buffalo, New York

                                    /s/William M. Skretny
                                    WILLIAM M. SKRETNY
                                    Chief Judge
                                    United States District Court